**MEISCHKE-SMITH et al. v. WARDELL, Internal Revenue Collector, et al**

(Circuit Court of Appeals, Ninth Circuit. February 12, 1923. Rehearing Denied April 2, 1923.)

No. 3818.

1. **Internal revenue ⬡⇒9—Pipe line corporation held distinct from corporation owning oil transported.**

Where all of the stock of a pipe line corporation was owned by the corporation for whom the oil was transported, the officers of the two companies were the same to a large extent, and the accounts of the pipe line company were kept in the office of the holding corporation, though its field force was separate, and it had a separate bank account, the two corporations were distinct, so that the pipe line company was liable for the war tax imposed by War Revenue Act Oct. 3. 1917, § 500, subd. (d),[1] on the amount paid for the transportation of oil by pipe line.

2. **Statutes ⬡⇒211—Title cannot be considered to determine meaning unless language is ambiguous.**

When the intent of Congress in enacting a statute is plain and the language is clear and unambiguous, nothing is left to construction, and the title cannot be considered in determining the meaning of the statute, as it can be when the language is ambiguous.

3. **Internal revenue ⬡⇒9—Tax on pipe line companies not limited to public utilities.**

The tax imposed by War Revenue Act Oct. 3, 1917, § 500, subd. (d),[1] equivalent to 5 per cent. of the amount paid for transportation of oil by pipe line, is not limited to transportation of oil by public utilities, though the subtitle under which that section appears refers to a tax on facilities furnished by public utilities.

4. **Internal revenue ⬡⇒9—Pipe line company held "public utility" under law of its organization.**

A pipe line company organized under the laws of California after the adoption of the public utilities act of that state (St. Cal. Ex. Sess. 1911, p. 18) sections 1 and 2 of which made it applicable to "public utilities," defined so as to include all pipe lines, and after the adoption of St. 1913, p. 657, § 2, making pipe line companies common carriers, and section 3, prohibiting the construction of pipe lines intended for transportation of oil other than common carriers, if the length exceeds 35 miles and it crosses any public highway, is a public utility, though it transports oil only for the corporation owning its stock, and therefore is liable for the tax imposed by War Revenue Act Oct. 3, 1917, § 500, subd. (d),[1] even if that tax is limited to public utilities.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Public Utility.]

5. **Internal revenue ⬡⇒2. 9—Provision taxing corporation for transporting its own oil is valid; oil company held liable for tax for transporting oil by pipe line.**

The provision of War Revenue Act Oct. 3, 1917, § 501,[2] requiring a pipe line company which transports its own oil to pay a tax equivalent to that imposed by the preceding section on companies transporting oil for hire, is constitutional and makes the company which owned the oil transported liable for the tax if the pipe line corporation is not to be regarded as a separate entity because of the relations between the two.

In Error to the District Court of the United States for the Second Division of the Northern District of California; William C. Van Fleet, Judge.

Action at law by W. Meischke-Smith and others, as trustees for the stockholders of the Valley Pipe Line Company, a dissolved corpora-

[1] Comp. St. 1918, Comp. St. Ann. Supp. 1919. § 6309⅛a.
[2] Comp. St. 1918, Comp. St. Ann. Supp. 1919. § 6309⅛b.
286 F.—50

tion, against Justus S.. Wardell, United States Collector of Internal Revenue for the First District, in which John L. Flynn and John P. McLaughlin were substituted as defendants after they succeeded to the office held by the original defendant. Judgment for defendants, and plaintiffs bring error. Affirmed.

Action at law to recover the sum of $100,474.67, amount assessed and paid by the Valley Pipe Line Company as a tax equivalent to five per centum of the amount paid for transportation of oil by pipe line.

E. J. McCutchen, J. M. Mannon, Jr., and F. F. Thomas, Jr., all of San Francisco, Cal. (McCutchen, Olney, Willard, Mannon & Greene, of San Francisco, Cal., of counsel), for plaintiffs in error.

J. T. Williams, U. S. Atty., and E. M. Leonard, Asst. U. S. Atty., both of San Francisco, Cal. (Carl A. Mapes, Solicitor of Internal Revenue, and Robert M. Foster, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for defendants in error.

Before MORROW and HUNT, Circuit Judges, and BEAN, District Judge.

MORROW, Circuit Judge. This case is before the court upon a writ of error to the District Court of the United States for the Northern District of California.

Plaintiffs in error (plaintiffs below) are the trustees in dissolution of the Valley Pipe Line Company, dissolved April 21, 1919, by decree of the superior court of the city and county of San Francisco.

The defendant in error, Justus S. Wardell, was collector of internal revenue for the First district of California prior to November, 1917, and up to December 31, 1920. John L. Flynn and John P. McLaughlin, the other defendants in error, have been the successors in office of the said Wardell, and were made defendants by the court in succession by orders of substitution.

This action was brought by the trustees of the Valley Pipe Line Company against Wardell, as collector of internal revenue, to recover $100,474.67, the aggregate of 14 monthly assessments of taxes levied, assessed, and collected from the Valley Pipe Line Company upon the transportation of oil by that company for the months of November and December, 1917, and January to December, inclusive, 1918, under subdivision (d) of section 500 of the War Revenue Act of October 3, 1917 (40 Stat. 314). The act provides:

"That from and after the first day of November, nineteen hundred and seventeen, there shall be levied, assessed, collected, and paid * * * (d) a tax equivalent to five per centum of the amount paid for the transportation of oil by pipe line. * * *"

A claim for the refund of these taxes was made to the Commissioner of Internal Revenue, and denied. Thereupon this action was commenced in the District Court, resulting in a judgment and nonsuit, from which this writ of error is prosecuted.

Plaintiffs in error contend that the pipe line transportation features of the War Revenue Act of October 3, 1917, do not authorize the imposition of this tax; that the tax is limited by the statute to public util-

ity corporations, basing that claim in part upon the terms of the subtitle carrying the taxing clause referred to. The subtitle is "Title V," providing a "War Tax on Facilities Furnished by Public Utilities."

The plaintiffs in error contend that as the Valley Pipe Line was a mere subsidiary corporation by which the Shell Company of California operated its own pipe line, it was not a public utility.

On the books of the Valley Pipe Line Company a monthly charge was made against the Shell Company of California for oil transported by its pipe line. The aggregate of these monthly charges for the period from November 1, 1917, to December 31, 1918, amounted to such a sum that a tax equivalent to 5 per centum of the amount so stated is the sum of $100,474.67, the amount assessed and paid by the Valley Pipe Line Company to the collector of internal revenue.

The antecedents of the Valley Pipe Line Company and the Shell Company of California and their relations to each other and to other corporations is set out in detail in the evidence; but we think it will be sufficient if we confine ourselves, for the present, to the consideration of the relations of these two corporations with each other and with the other corporations named during the period involved in this assessment.

The Anglo-Saxon Petroleum Company, Limited, a British corporation, owned the entire capital stock of the California Oil Fields, Limited, and the entire capital stock of the Shell Company of California, organized under the laws of California on January 30, 1915.

The California Oil Fields, Limited, owned and operated the oil fields at Coalinga, Cal. The Shell Company owned a refinery plant at Martinez, Cal. The Valley Pipe Line Company was organized under the laws of California on April 17, 1914.

During the period involved in this assessment, the Shell Company owned all the capital stock of the Valley Pipe Line Company except the qualifying shares held by the directors of the latter company. The Valley Pipe Line Company owned and operated the pipe line connecting the oil fields at Coalinga with the refinery plant of the Shell Company at Martinez, Cal. The distance between the Coalinga oil fields and the refinery at Martinez is 170 miles. The pipe line crosses the state highway at certain points, but nowhere parallels it.

During the period involved in this assessment, the operations of the pipe line and the relations between the Valley Pipe Line Company and the Shell Company of California were as follows:

The books of the Valley Pipe Line Company were kept in the offices of the Shell Company by employees of the latter company, and the Shell Company made a book charge for this service to the Valley Pipe Line Company of $2.500 a month. The Valley Pipe Line Company, however, had its own field organization and its own employees for its field operations, and for the actual field management and operation of the pipe line. For taking care of its expenses in this regard it had its own account in the Anglo & London-Paris National Bank. Its field employees were paid by checks upon this bank. The vouchers from the field came into the office of the Shell Company in San Francisco and were audited by Shell Company employees, and primarily by one

G. E. Gordon, the chief accountant of the Shell Company in its San Francisco office, and after having been O. K.'d by him, were passed on to officers of the Shell Company (who were also officers of the Valley Pipe Line Company) and were vised by the latter. The latter then signed checks upon the account of the valley Pipe Line Company on the Anglo & London-Paris National Bank, in payment of these accounts. The items thus paid are shown in the journal and ledger of the Valley Pipe Line Company.

From time to time, as the funds of the Valley Pipe Line Company in the account at the Anglo & London-Paris National Bank (and this account contained all of the funds which said Valley Pipe Line Company had anywhere with the exception of petty cash held in the field which originated from this account) would become depleted, the fact would be called to the attention of the officers of the Valley Pipe Line Company who were also officers of the Shell Company, and a sufficient amount to meet the requirements of the Valley Pipe Line Company would thereupon be deposited by the Shell Company in the account of the Valley Pipe Line Company at the Anglo & London-Paris National Bank. These amounts would be carried into the books of the Valley Pipe Line Company as a credit to the Shell Company.

The books of the Valley Pipe Line Company therefore showed as charges against the Shell Company the amounts charged each month for transporting oil, and as credits, the amounts advanced by the Shell Company to the Valley Pipe Line Company to carry on its operations; also, numerous little miscellaneous items on one side or the other.

[11] Were these transactions between the Shell Company and the Valley Pipe Line Company of such a character that they constituted in law (and specifically the War and Revenue Act of October 3, 1917) the transactions of a single corporation, dealing with its own property in its own way; or were they the transactions of two independent corporations dealing co-operatively with each other with respect to the transportation of oil, an article of commerce?

In Pullman Palace Car Co. v. Missouri Pacific Co., 115 U. S. 587, 6 Sup. Ct. 194, 29 L. Ed. 499, suit was brought by the Pullman Car Company in the United States Circuit Court for the Eastern District of Missouri to enjoin the Missouri Pacific Company from discontinuing the use of the drawing-room and sleeping cars of the Pullman Company on the line of the St. Louis, Iron Mountain & Southern Company in the transportation of passengers; from refusing to haul such cars on passenger trains running on such line; and from contracting with any other person for supplying like cars for that use.

The Circuit Court dismissed the bill on demurrer, and the Pullman Car Company appealed.

The Pullman Car Company had a written contract with the Missouri Pacific to furnish the latter with drawing-room and sleeping cars sufficient to meet all the requirements of travel, and the Missouri Pacific Company agreed to haul the same on the passenger trains on its own line of road and on all roads which it then controlled, or might thereafter control, by ownership, lease, or otherwise. The railway company also agreed that the Pullman Company should have the ex-

clusive right for a term of years not then expired to furnish for the use of the railway company drawing-room or parlor and sleeping cars on all the passenger trains of the railway company, and over its entire line of railway, and on all roads which it controlled, or might thereafter control, by ownership, lease, or otherwise, and that it would not contract with any other party to run said class of cars and over said lines of road during the period of the lease.

After the making of this contract, the Missouri Pacific had consolidated with itself certain other companies under the laws of Missouri, retaining its former name. The consolidated company assumed all the obligations of the separate consolidating companies, and continued to use and operate the former road together with other consolidated lines.

The Missouri Pacific Company had become the owner of all but 1195 of the 220,682 shares of the capital stock of the St. Louis, Iron Mountain & Southern Company. Five of the directors of the Missouri Pacific were also directors in the St. Louis, Iron Mountain & Southern Company, and the two roads were operated under the same general management. The general offices of the two companies were kept together, and both roads were managed substantially by the same persons.

The bill alleged that this ownership by the Missouri Pacific Company was with the intent and purpose of controlling the management and administration of the St. Louis, Iron Mountain & Southern Company, and for the purpose of subordinating in effect the St. Louis, Iron Mountain & Southern Company and the Missouri Pacific Company to the same management and control and of running and operating said roads as one line and in the interest of Missouri Pacific Company. The demurrer admitted to be true all facts stated in the bill which were well pleaded.

The question was whether the St. Louis, Iron Mountain & Southern Company was controlled by the consolidated Missouri Pacific Company within the meaning of the contract and the law governing corporate relations.

The court was of the opinion that the railroad of the St. Louis, Iron Mountain & Southern Company was not controlled by the Missouri Pacific in such a way as to require that company to haul the Pullman cars over it if the contract was binding on the new company to the same extent it would be on the old, were that company still in existence and standing in the place of the new.

The court said further:

"Confessedly the St. Louis, Iron Mountain & Southern Company keeps up its own corporate organization. It operates its own road. It has its own officers and makes its own bargains. The Missouri Pacific owns all, or nearly all, its stock, and in that way can determine who shall constitute its board of directors, but there the power of that company over the management stops. The board when elected has controlling authority, and for its doings is not necessarily answerable to the Missouri Pacific Company. The two roads are substantially owned by the same persons and operated in the same interest, but that of the St. Louis, Iron Mountain & Southern Company is in no legal sense controlled by the Missouri Pacific. * * *

"The Missouri Pacific Company has bought the stock of the St. Louis, Iron Mountain & Southern Company and has effected a satisfactory election of di-

rectors but this is all. It has all the advantages· of a control of the road, but that is not in law the control itself. Practically it may control the company, but the company alone controls its road. In a sense, the stockholders of a corporation own its property, but they ·are not the managers of its business or in the immediate control of its affairs. Ordinarily they elect· the governing body of the corporation, and that body controls its property. ,Such is the case here. The Missouri Pacific Company owns enough of the stock of the St. Louis, Iron Mountain & Southern to control the election of directbrs, and this it has done. The directors now control the road through their own agents and executive officers, and these agents and officers are in no way under the direction of the Missouri Pacific Company. If they or the directors act contrary to the wishes of the Missouri Pacific Company, that company has no power to prevent it, except by the election, at the proper time and in the proper way, of other directors, or by some judicial proceeding for the protection of its interest as a stockholder. Its rights and its power are those of a stockholder only. It is not the corporation, in the sense of that term as applied to the management of the corporate business or the control of the corporate property."

It was held by the Supreme Court that the Missouri Pacific Company did not control the St. Louis, Iron Mountain & Southern Company with respect to the hauling of the drawing-room and sleeping cars of the Pullman Company. The decree of the Circuit Court, dismissing the bill, was accordingly affirmed.

In the more recent case of Peterson v. Chicago, Rock Island & Pacific Railway, 205 U. S. 364, 27 Sup. Ct. 513, 51 L. Ed. 841, action was brought by the plaintiff in error against the defendant in error (afterwards referred to as the Pacific Company) upon a certificate from the Circuit Court for the Northern District of Texas, raising the question of jurisdiction of the latter court over the action. The Pacific Company was an Illinois corporation. The charge was that that company was engaged in carrying on its business in the state of Texas in the name and through the Chicago, Rock Island & Gulf Railroad, a corporation of the state of Texas, which latter company, it was alleged, was an auxiliary corporation, and agent of the plaintiff, and was then and there dominated and controlled by the Pacific Company; its lines of railroad being operated by the Pacific Company as part of the Rock Island system.

It was held by the Supreme Court that the Pacific Company was not doing business in the state of Texas simply because another railroad, of which it owned practically the entire capital stock, did do business therein. The latter was a separate legal entity, authorized under the laws of Texas, and legitimately carrying on business there. The Circuit Court was accordingly without jurisdiction in the case.

The plaintiffs in error cite the case of Southern Pacific Co.. v. Lowe, 247 U. S. 330, 38 Sup. Ct. 540, 62 L. Ed. 1142, and the case of Gulf Oil Corporation v. Lewellyn, 248 U. S. 71, 39 Sup. Ct. 35, 63 L. Ed. 133, as holding a different view.

We do not think that these two cases are open to such construction. On the contrary, we are of the opinion that they in effect affirm and supplement the Pullman and Peterson Cases from a different point of view. In both cases the questions in controversy arose under the federal Income Tax Act of October 3, 1913 (38 Stats. 114, 166), and related to dividends accumulated prior to the act.

In the first case, the Southern Pacific Company, owning all the cap-

ital stock of the Central Pacific Company, and in the actual physical possession of the railroads and all other assets of the Central Pacific Company and in charge of all of its operations, brought suit to recover from Lowe, the collector of internal revenue, a tax assessed against it and paid upon certain dividends received by the Southern Pacific Company from the Central Pacific Company, the subsidiary corporation, in the early part of the year 1914, but which were in fact paid out of the surplus accumulated by the Central Pacific not only prior to the effective date of the act (March 1, 1913), but prior to the adoption of the Sixteenth Amendment of the Constitution of the United States (February 25, 1913), authorizing the taxation of the income from property without apportioning the tax among the states according to population.

The dividends were declared and paid the Southern Pacific Company during the first six months of the year 1914; but as the surplus out of which the dividends were paid had been accumulated by the Central Pacific Corporation prior to January 1, 1913, the payment in 1914 was held to be only constructive, being carried into effect by bookkeeping entries which simply reduced the apparent surplus of the Central Pacific and reduced the apparent indebtedness of the Southern Pacific to the Central Pacific by precisely the amount of the dividends.

The court held that the accumulations, having accrued to the Central Pacific through earnings before the adoption of the Sixteenth Amendment and the effective date of the Income Tax Act of 1913, would be regarded as its capital, and not as income for the purpose of the act, and that such dividends were not taxable as income of the share holding company prior to the effective date of the Income Tax Act of 1913.

This is a clear and distinct recognition of the fact that the two corporations were separate and independent of each other for taxation purposes, and that the real transaction, as shown by the books of the Central Pacific Company (Southern Pacific Co. v. Lowe, [D. C.] 238 Fed. 847, 849), was the fact that the dividends sought to be taxed against the Southern Pacific Company in 1914 had been paid out of the surplus earnings of the Central Pacific Company which had accrued prior to June 30, 1909. In other words, the real transaction was that of the subsidiary company.

In the second case, the Gulf Oil Corporation was a holding company, owning all the stock in certain other corporations, except the qualifying shares held by the directors.

Prior to January 1, 1913, the earnings of the subsidiary companies had been used in common by the several subsidiary companies in the acquisition of property and in carrying on the business.

About March 1, 1913, such accumulated earnings in prior years were taken over by the holding corporation in the form of dividends declared by the several subsidiaries, equal in amount to their respective interests. It was held by the Supreme Court, as in the case of the Southern Pacific Company, that such dividends were not taxable as income under the Act of October 3, 1913, where the earnings of the subsidiary companies had accrued before the tax year and had prac-

tically become capital, citing Lynch v. Turrish, 247 U. S. 221, 228, 38 Sup. Ct. 537, 62 L. Ed. 1087. Here again we have the recognition of the separate and independent character of dominant and subsidiary corporations for the purpose of taxation. And the real transaction was that of the subsidiary corporations. Applying that rule here, we find that the real transaction was that of the Valley Pipe Line Company, confirmed by the entries in the books of the company.

It seems very plain that these latter cases do not, in any way, modify the decision of the Supreme Court in the Pullman and Peterson Cases; but, on the contrary, reaffirming them from a point of view that makes all four cases indisputable authority in the present case.

The opinion of the Circuit Court of Appeals for the Fifth Circuit in Walker v. Gulf & I. R. Co. of Texas, 269 Fed. 885, is in substance to the same effect. The latter case is also an authority dealing more directly with the question involved in the present case.

[2, 3] It is next contended by the plaintiffs in error that the subtitle of the statute imposing this war revenue tax limits its scope to public utilities. We do not think it is necessary to resort to the subtitle of this statute for its correct interpretation. When the meaning of an act of Congress is ambiguous, resort may be had to the title, as well as to any other feature of the act, to remove such ambiguities; but when the intent is plain and the language of the statute clear and unambiguous, nothing is left to construction. The cases are numerous in the federal courts, as well as elsewhere, supporting this rule, and need not be cited. We think the taxing clause in this statute is perfectly plain and needs no construction to determine that it is not so limited. But we pass that question because we think it can be satisfactorily determined that the Valley Pipe Line was a public utility furnishing facilities for the transportation of oil and therefore within the express terms of the statute.

[4] What constitutes a public utility has been a subject of comprehensive legislation by the state of California.

In section 1 of the act of the Legislature, approved December 23, 1911, relating to Public Utilities (Stats. of California, Extra Session, 1911, p. 18), it is provided:

"This act shall be known as the 'Public Utilities Act' and shall apply to the public utilities and public services herein described and to the commission herein referred to."

In section 2, par. (m), of the same act, it is provided:

"The term 'pipe line,' when used in this act, includes all real estate, fixtures and personal property, owned, controlled, operated or managed in connection with or to facilitate the transmission, storage, distribution or delivery of crude oil or other fluid substances except water through pipe lines."

In paragraph (bb) of the same section, page 22, it is provided:

"The term 'public utility,' when used in this act, includes every common carrier, pipe line corporation, * * * as those terms are defined in this section, and each thereof is hereby declared to be a public utility and to be subject to the jurisdiction, control and regulation of the commission and to the provisions of this act."

In section 2 of the act of Legislature approved June 4, 1913, in effect August 10, 1913 (Stats. of California 1913, pp. 657, 658), it is provided:

"Every corporation organized and existing under the laws of the state of California * * * to transport, or to engage in the business of transporting, * * * any crude oil, petroleum or the products thereof, * * * or participating in the control of any pipe line or pipe lines with pumping station or stations, or other appurtenant, equipment or plant constructed and maintained, or to be constructed or maintained for the transportation of crude oil, petroleum, or the products thereof, actually engaged or engaging in such operation or transportation, directly or indirectly, or shares, directly or indirectly, in the business of such operation or transportation, is hereby declared to be a common carrier and subject to the provisions of the 'Public Utilities Act' of the state of California, approved December 23, 1911."

In section 3, St. 1913, p. 533, it is provided:

"The construction hereafter of any pipe line or pipe lines intended for the transportation of crude oil, petroleum or any of its products, *otherwise than as a common carrier* for an aggregate distance of thirty-five or more miles within this state, continuously or otherwise, by means of such pipe line or pipe lines, in whole or in part, for any distance whatsoever, across, along, over or under any public highway or public road within this state is declared to be contrary to public policy and is hereby expressly prohibited."

When the Valley Pipe Line Company was incorporated under the laws of the state of California on April 17, 1914, and the Shell Company was incorporated under the same laws on January 30, 1915, these acts of the Legislature were on the statute books of the state in full force and effect, and became as much a part of the articles of incorporation of the two companies as though they had been written thereon.

In Waters-Pierce Oil Co. v. Texas, 177 U. S. 28, 43, 20 Sup. Ct. 518, 524 (44 L. Ed. 657), the Supreme Court, referring to a foreign corporation in the state of Texas, said:

"A corporation is the creature of the law, and none of its powers are original. They are precisely what the incorporating act has made them, and can only be exerted in the manner which that act authorizes. In other words, the state prescribes the purposes of a corporation and the means of executing those purposes. Purposes and means are within the state's control. This is true as to domestic corporations. It has even a broader application to foreign corporations."

We must presume, therefore, that the Valley Pipe Line Company constructed its pipe line from the oil fields of Coalinga to the refinery at Martinez, a distance of 170 miles, for the purpose of transporting oil as a common carrier under the provisions of the Public Utilities Act, and that the transportation here in question was so carried on, and this presumption is not overcome by the claim that the pipe line was engaged only in transporting oil for the Shell Company (owning all the stock of the Valley Pipe Line Company), and not for the public.

[5] But assuming that the Shell Company, by reason of its ownership of the stock of the Valley Pipe Line Company, was in fact transporting oil for itself alone, then under section 501 of the War Revenue Act we find that it was subject to a tax equivalent to the tax imposed by section 500 of the act. That section is as follows:

"That the taxes imposed by section five hundred shall be paid by the person, corporation, partnership, or association paying for the services or facilities rendered.

"In case such carrier does not, because of its ownership of the commodity transported, or for any other reason, receive the amount which as a carrier it would otherwise charge, such carrier shall pay a tax equivalent to the tax which would be imposed upon the transportation of such commodity if the carrier received payment for such transportation; Provided, that in case of a carrier which on May first, nineteen hundred and seventeen, had no rates or tariffs on file with the proper Federal or State authority, the tax shall be computed on the basis of the rates or tariffs of other carriers for like services as ascertained and determined by the Commissioner of Internal Revenue: Provided further, that nothing in this or the preceding section shall be construed as imposing a tax (a) upon the transportation of any commodity which is necessary for the use of the carrier in the conduct of its business as such and is intended to be so used or has been so used; or (b) upon the transportation of company material transported by one carrier, which constitutes a part of a railroad system, for another carrier which is also a part of the same system."

It does not appear that the transportation comes within the exceptions mentioned in any of the provisos contained in the section. The tax is constitutional. Knowlton v. Moore, 178 U. S. 41, 20 Sup. Ct. 747, 44 L. Ed. 969; McCray v. United States, 195 U. S. 27, 24 Sup. Ct. 769, 49 L. Ed. 78, 1 Ann. Cas. 561; Flint v. Stone Tracy Co., 220 U. S. 107, 31 Sup. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312; Billings v. United States, 232 U. S. 261, 34 Sup. Ct. 421, 58 L. Ed. 596.

Judgment of the District Court is affirmed.